**UNITED STATES, Appellee,**

v.

**Private E2 Maurice RUSH, United States Army, Appellant.**

**ARMY 9701687.**

U.S. Army Court of Criminal Appeals.

16 Sept. 1999.

For Appellant: Colonel John T. Phelps II, JA; Colonel Adele H. Odegard, JA; Major Leslie A. Nepper, JA; Captain Paul J. Perrone, Jr., JA (on brief).

For Appellee: Colonel Russell S. Estey, JA; Lieutenant Colonel Eugene R. Milhizer, JA; Captain Mary E. Braisted, JA (on brief).

Before TOOMEY, Senior Judge, CARTER, and NOVAK, Appellate Military Judges.

## OPINION OF THE COURT

NOVAK, Judge:

A special court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of breach of the peace, aggravated assault (two specifications), and communicating a threat, in violation of Articles 116, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 916, 928, and 934 [hereinafter UCMJ]. The con-

vening authority approved the adjudged sentence to a bad-conduct discharge, confinement for six months, forfeiture of $600.00 pay per month for three months, and reduction to Private E1. The appellant's case is before this court for automatic review pursuant to Article 66, UCMJ.

The appellant asserts that the military judge erred when he denied the trial defense counsel's request for the standard presentencing instruction describing the ineradicable stigma of a punitive discharge. We find that the military judge abused his discretion, but find no prejudice to the appellant under the circumstances of his case.

### Facts

The appellant was convicted of incidents involving two fellow service-members. First, the appellant pointed a knife at a soldier and lunged at him after the soldier followed him outside a building to smooth over a previous brief, minor, contentious discussion. Later, he threatened to injure this same soldier in retaliation for the soldier's reporting the aggravated assault. Second, in an unrelated incident, the appellant attacked a United States Marine Corps trainee, first with his fists, then with a knife, apparently because the appellant was offended by the trainee's stare. That aggravated assault resulted in a knife wound to the trainee's temple.

During two brief Article 39(a), UCMJ, sessions held prior to presentation of sentencing evidence, the military judge discussed sentencing instructions, but only to inquire whether the defense counsel desired the instruction explaining unsworn statements. The record contains no other indication of any in-court or out-of-court session concerning sentencing instructions.

During his sentencing instructions, the military judge read the standard bad-conduct discharge instruction:

A bad-conduct discharge. You are instructed that a bad-conduct discharge deprives a soldier of virtually all benefits administered by the Veterans' Administration and the Army establishment. A bad-conduct discharge is a severe punishment, and may be adjudged for one who, in the discretion of the court, warrants more se-

vere punishment for bad conduct, even though the bad conduct may not constitute commission of serious offenses of a military or civil nature. In this case, if you determine to adjudge a punitive discharge, you may sentence Private Rush to a bad-conduct discharge; no other type of discharge may be ordered in this case.

*See* Dep't of Army, Pam. 27–9, Military Judges' Benchbook 70 (30 Sep. 1996) (currently unchanged at 70.1, Change 1, 30 Jan. 1998) [hereinafter Benchbook]. He did not read any portion of the standard ineradicable stigma instruction.[1] After instructions, the military judge asked whether either counsel wanted additional instructions or objected to those given. The defense counsel replied, "Defense would request the ineradicable stigma instruction, Your Honor." The military judge answered, "I'm not going to give that instruction, Captain [ ]." He offered no explanation.

### Historical Development of the Ineradicable Stigma of a Punitive Discharge Instruction

As early as 1962, our superior court recognized that the consequences of a punitive discharge are so severe that it is a more serious punishment than confinement. In *United States v. Johnson*, 12 U.S.C.M.A. 640, 31 C.M.R. 226, 231, 1962 WL 4400 (1962), the court discussed the *onerous consequences* of a punitive discharge:

[I]t is certain that the damage visited upon an accused by a sentence to confinement may not involve the serious consequences of a punitive discharge. As we have on occasion noted, a bad-conduct discharge affects entitlement to those benefits which a grateful nation has made available to individuals who have served it honorably. Moreover, the ineradicable stigma of a punitive discharge is commonly recognized by our modern society, and the repugnance

with which it is regarded is evidenced by the limitations which it places on employment opportunities and other advantages which are enjoyed by one whose discharge characterization indicates he has been a good and faithful servant.

The court also noted:

[Congress] has demonstrated uncommon concern for punishments extending to dishonorable or bad-conduct discharges. Thus, aside from judicial review under the Code, it has provided administrative machinery in the form of discharge review boards and boards for the correction of military and naval records to insure that these iniquitous penalties received continuing and unremitting attention.

(citations omitted).

The 1969 version of the Military Judges' Guide included an instruction describing the ineradicable stigma of a punitive discharge consistent with the *Johnson* opinion. Dep't of Army, Pam. 27–9, para. 8–4a(1), Military Judges' Guide (May 1969). This 1969 ineradicable stigma instruction was almost identical to the current instruction, and was in effect during the 1981 court-martial of *United States v. Soriano*, 15 M.J. 633 (N.M.C.M.R.1982), *aff'd on unrelated grounds*, 20 M.J. 337 (C.M.A.1985). In that case, based on a law review article[2] which questioned whether punitive discharges still carried significant adverse consequences, the trial counsel successfully requested a modified ineradicable stigma instruction. Thus, the military judge instructed the members that a punitive discharge "may" place limitations on employment and "may" affect an appellant's future legal rights, economic opportunities, and social acceptability. *Soriano*, 20 M.J. at 341.

In May 1982, before the Navy–Marine Court of Criminal Appeals decided *Soriano* on appeal, a new Military Judges' Benchbook

---

1.  Benchbook at 69:

    You are advised that the ineradicable stigma of a punitive discharge is commonly recognized by our society. A punitive discharge will place limitations on employment opportunities and will deny the accused other advantages which are enjoyed by one whose discharge characterization indicates that (he)(she) has served hon-

    orably. A punitive discharge will affect an accused's future with regard to (his)(her) legal rights, economic opportunities, and social acceptability.

2.  Captain Charles E. Lance, *A Criminal Punitive Discharge—An Effective Punishment?*, 79 Mil. L.Rev. 1 (1978).

was issued with no ineradicable stigma instruction, perhaps accepting the view that an "extremely tolerant" society had become more forgiving of punitive discharges. Dep't of Army, Pam. 27–9, Military Judges' Benchbook, para. 2–44 (1 May 1982) [hereinafter 1982 Benchbook]; *Soriano*, 20 M.J. at 342.

By 1985, the *Soriano* case had progressed through successive appeals to the then Court of Military Appeals. That court opined that the modified "may" instruction given by the military judge at the 1981 trial "conflict[ed] with the long established view of th[e] Court that Congress and the President intended [a punitive discharge] to be severe and to be treated as severe by those who impose sentences at courts-martial." *Soriano*, 20 M.J. at 342 (citations omitted).[3] The court reiterated its adherence to that principle, citing the *Hearings on H.R. 2498 Before a Subcommittee of House Armed Services Committee*, 81st Cong., 1st Sess. 649 (subpara. 3), *reprinted in Index and Legislative History, Uniform Code of Military Justice* (1949). The court also specifically rejected dicta in *United States v. Ford*, 12 M.J. 636, 638 (N.M.C.M.R.1981), *pet. den.*, 13 M.J. 115 (C.M.A.1982), that "[d]ramatic changes affecting the practical effect of a bad-conduct discharge ha[d] occurred [in previous decades, changing] the current objective severity of the punishment." *Soriano*, 20 M.J. at 342–43. *Accord United States v. Berger*, 23 M.J. 612, 616 (A.F.C.M.R.1986) (condemns similar "may" instruction). Nevertheless, the court found that the modified instruction was neither prejudicial per se nor plain error. They also found no prejudice, based on the instructions as a whole, the serious and

numerous offenses, a prior court-martial conviction in aggravation, and no suggestion that a discharge was inappropriate. *Id.* at 343. Although the *Soriano* opinion did not expressly state that an ineradicable stigma instruction was required, Chief Judge Everett, concurring in the summary denial of petition for review in *United States v. Cross*, 21 M.J. 87, 88 (C.M.A.1985), cited *Soriano* for the proposition that "elimination from the service by sentence of a court-martial is such a serious matter that the failure to charge the members as to its effect is error."

Despite *Soriano* and *Cross*, the ineradicable stigma instruction was not returned to the Benchbook until 1994. 1982 Benchbook, Update Memo 11 (19 July 1994). Thus, in the interim, the then Air Force Court of Military Review decided *United States v. Gadson*, 30 M.J. 749 (A.F.C.M.R.1990), in which the military judge refused to instruct the members on the deleterious effect a punitive discharge might have on "future employment benefits" of the appellant. He advised counsel that the matter could be argued and gave the standard instructions from the 1982 Benchbook (as changed in 1986). Our sister court held that the military judge did not abuse his discretion by refusing to give the ineradicable stigma instruction, and in any case, the failure to give the requested instruction was not prejudicial. *Id.* at 750–51; *see also United States v. Hawkins*, 30 M.J. 682 (A.F.C.M.R.1990) (unspecified additional instruction contained matters more appropriate for counsel argument; standard instruction from modified 1982 Benchbook was sufficient).[4]

---

3. The court relied in part on *United States v. Wheeler*, 17 U.S.C.M.A. 274, 38 C.M.R. 72, 74, 1967 WL 4375 (1967), which contains the oft-cited pronouncement:

[T]he ordering of a punitive discharge so characterizes an individual that his whole future is utterly destroyed. He is marked far beyond the civilian felon, hampered as he may be by the sneering term "ex-con," for, justifiedly or not, the punitive discharge so dishonors and disgraces an accused that he finds employment virtually impossible; is subjected to many legal deprivations; and is regarded with horror by his fellow citizens. Truly, it has come to be the modern equivalent of the ancient practice of branding felons, and the stain it leaves is as ineradicable.

4. We note that while *Gadson* indicated that an Air Force judge was using the Army benchbook without the ineradicable stigma instruction, case law reveals that some judges were nevertheless incorporating some version of the instruction into their trial scripts. *See United States v. Maharajh*, 28 M.J. 797 (A.F.C.M.R.1989) (military judge announced that the stigma of a punitive discharge was commonly recognized and affected legal rights, economic opportunities, and social acceptability); *United States v. Washington*, 1992 CMR LEXIS 527 (N.M.C.M.R.1992) (during June 1991 sentencing hearing, the military judge instructed the members, "A bad-conduct discharge is a virtually ineradicable stigma from which the recipient can expect to incur substantial prejudice during his lifetime.")

At present, the ineradicable stigma instruction is not given uniformly at military courts-martial. In Army courts-martial, the ineradicable stigma instruction found in the Benchbook is considered part of the standard advice given to members to explain "how serious bad-conduct discharges are viewed." *United States v. Collins*, 44 M.J. 830, 833 n. 6 (Army Ct.Crim.App.1996), *pet. den.*, 47 M.J. 76 (1997). By contrast, Navy and Marine Corps guidelines do not include any portion of the ineradicable stigma instruction. Trial Guide 1999, 1 May 1999, pp. 90–91. The Air Force and Coast Guard Trial Judiciary publish no separate benchbook, although apparently not all judges read the Benchbook instruction verbatim. *See, e.g.,* Chief Judge, Air Force Trial Judiciary, Trial Script (omits the word "ineradicable").

### Standard of Review

■ Like our superior court, we "review a military judge's decision whether and how to instruct on the consequences of a sentence for abuse of discretion." *United States v. Perry*, 48 M.J. 197, 199 (1998) (citation omitted). To constitute an abuse of discretion, a military judge's action must be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Miller*, 46 M.J. 63, 65 (1997) (citations omitted).

### Discussion

The standard Benchbook instructions on punitive discharges advise the members of two significant, but different, adverse consequences of a punitive discharge. First, such a discharge deprives the accused of virtually all benefits administered by the Department of Veterans Affairs and the Army. The military judge in this case did so instruct the members. However, a second, totally different, yet equally important consequence is a

punitive discharge's impact on a soldier's return to the civilian community and its adverse effect on his legal rights, economic opportunities, and social acceptability. It is this second ineradicable stigma instruction that the military judge refused to give without any explanation or justification.

■ After reviewing the historical development of the services' trial judiciary script guidelines and applicable appellate case law, we conclude that the ineradicable stigma instruction is a required sentencing instruction.[5] A punitive discharge is "a permanent record with life-long adverse implications" and court-martial members must be instructed accordingly. *Collins*, 44 M.J. at 833. *See United States v. Smith*, 50 M.J. 451, 455 (1999) (appellate court must independently determine the appropriateness of an instruction). We reject the government's assertion that the ineradicable stigma instruction is optional because Rule for Courts–Martial 1005(e)(1) [hereinafter R.C.M.] does not require it: the same omission from paragraph 76b, *Manual for Courts–Martial, United States,* 1969 (Rev. ed.), did not prevent our superior court from emphasizing the importance of this instruction in *Soriano.* Notwithstanding R.C.M. 1005(e)(1), a military judge has "a duty to give *appropriate* sentence instructions." *United States v. Greaves*, 46 M.J. 133, 139 (1997); R.C.M. 1005(a).[6]

■ Because the standard Benchbook instructions are based on a careful analysis of current case law and statute, an individual military judge should not deviate significantly from these instructions without explaining his or her reasons on the record. It is possible that this military judge harbored the belief that a punitive discharge no longer

5. Unlike the case where a "military accused . . . requests a non-standard instruction [and] must, at a minimum, establish both the legal and factual predicates for the request," *Perry*, 48 M.J. at 200 (Effron, J., concurring in part and in the result), this appellant met that burden merely by requesting that the military judge adhere to standard instructions. In this regard, we recognize and compliment the longstanding and concerted on-going efforts of the trial judiciary to ensure that the Benchbook reflects the current state of case law and statute. *See, e.g.,* Lieutenant Colo-

nel Stephen R. Henley and Lieutenant Colonel Donna M. Wright, *Army Law., Annual Review of Developments in Instructions—1998* (March 1999).

6. We also reject the government's assertion that the note found on page 67 of the current benchbook, "NOTE: The following instruction may be given in the discretion of the trial judge," makes discretionary every instruction on the four following pages.

carried a stigma, or that the economic consequences of a discharge were not relevant to the members' sentencing decision,[7] or that the instruction was not appropriate in this appellant's case. We cannot divine his reasons from a blank record. Under the circumstances of this case, because the military judge inexplicably refused to give the standard sentencing instruction after a timely request without stating any reason for his decision to deviate from the Benchbook, we find his action to be arbitrary and clearly unreasonable, and thus an abuse of discretion.[8]

■ We next turn to the question of whether this appellant was prejudiced by the military judge's failure to give the requested instruction. UCMJ art. 59(a); *United States v. Gillenwater,* 43 M.J. 10, 13 (1995); *United States v. McMonagle,* 38 M.J. 53, 61 (C.M.A. 1993). Mindful of the factors assessed in *Soriano,* we have reviewed: the instructions as a whole, which included a charge that a bad-conduct discharge is "a severe punishment"; the relative seniority and experience of the panel; the complete lack of provoca-

tion for the appellant's two knife assaults; and the potential severity of the wound near the Marine victim's eye. In *Soriano,* there was no suggestion a punitive discharge was inappropriate. In the instant case, on the other hand, the appellant's counsel implied that a punitive discharge was inappropriate by arguing that forfeitures and forty-five days of restriction and hard labor without confinement alone were sufficient punishment, given what the counsel characterized as the appellant's brief, but meritorious service and relatively minor charges and their minimal effects.[9] The members apparently rejected this suggestion that the appellant deserved only the equivalent of Article 15, UCMJ, punishment when they sentenced him instead to the maximum confinement and reduction allowed at a special court-martial, in addition to the bad-conduct discharge. We find overall, considering the evidence of record and the above circumstances, that the appellant was not prejudiced as to his sentence by the omission of the ineradicable stigma instruction.[10]

7. The Air Force Court's holding in *Gadson* that the ineradicable stigma instruction was discretionary relied in part on *United States v. Henderson,* 29 M.J. 221 (C.M.A.1989), which held, under the facts of that case, that the effect of a punitive discharge on retirement benefits was a confusing, inadmissible collateral matter. We reject this collateral consequences argument and find the results of a punitive discharge to be relevant mitigation evidence. *Greaves,* 46 M.J. at 138–39 (emphasizing that a military judge "cannot minimize matters in mitigation before sentence," distinguishing *Henderson* factually, and establishing a punitive discharge's effect on retirement benefits as relevant mitigation evidence in an appropriate case) (citation omitted).

8. Although this military judge may have made a practice of omitting the questioned instruction, we are not holding that such an omission constitutes plain, that is, obvious and substantial, error. Failure to read even a standard instruction is still properly subject to the waiver provisions of R.C.M. 1005(f). "The waiver rules are designed to prevent defense counsel from remaining silent, making no objection, and then raising the issue of appeal for the first time, long after any possibility of curing the problem has vanished. It is important to encourage all trial participants to seek a fair and accurate trial the first time around." *United States v. Reist,* 50 M.J. 108, 110 (1999) (citations omitted). It is conceivable, for example, that an appellant who

wants to avoid incarceration at all costs, or who is returning to a family business, might concur with the omission of the instruction as part of his sentencing theory. In the appellant's case, timely objection by trial defense counsel at the time instructions were given preserved this issue for appeal.

9. The appellant's defense counsel did argue to the members that "the conviction itself" would end the appellant's military career and stigmatize him forever as a convicted felon, but he never conceded the appropriateness or inevitability of a punitive discharge. On the contrary, the members could infer from his argument that the stigma of a conviction is so great that the further stigma from a bad-conduct discharge would be an unnecessarily harsh punishment.

10. Alternatively, using the three-part test set out in *United States v. Damatta–Olivera,* 37 M.J. 474 (C.M.A.1993), we find that the requested instruction was correct and not covered in other instructions, but that failure to read the instruction did not seriously impair the appellant from effectively presenting his sentencing case. *See Gadson,* 30 M.J. at 750 (the appellant was allowed to argue or otherwise present evidence on the effects of a punitive discharge). Indeed, as suggested above, the trial defense counsel's argument could be construed to imply that a bad-conduct discharge was inappropriate because of the harsh effects of the conviction itself.

We have considered the matters submitted by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge TOOMEY and Judge CARTER concur.